HOUSTON, Justice.
Blount County (the “County”) and the Blount County Commission (the “Commission”) sued the Blount County Health Care *444 Authority (the “Authority”) for a declaratory judgment concerning the Special Health Care Tax that has been collected in Blount County since 1950. Ambac Assurance Corporation, which had issued a policy insuring principal and interest payments on certain bonds secured by the tax, intervened as a defendant. The trial court entered a judgment in favor of the plaintiffs. The Authority and Ambac appealed that judgment. We reverse and remand.
In 1949, the citizens of Blount County, pursuant to Amendment 72 of the Alabama Constitution of 1901, approved the Special Health Care Tax, to be levied and collected at the rate of four mills on each dollar of taxable property in Blount County.
Pursuant to Amendment 76 of the Alabama Constitution of 1901, the Commission passed a resolution establishing a public corporation that was to act as the agent of the Commission for the purpose of acquiring, constructing, equipping, operating, and maintaining public hospital facilities of all kinds within Blount County. The corporation that was created was the predecessor to the Authority. The Authority eventually replaced the original corporation and was given the same purposes and powers.
By Act No. 114 (Reg.Session), Ala. Acts 1978, a local act, the Legislature provided for a referendum in Blount County to determine whether the citizens of that county wished to continue to levy and collect the Special Health Care Tax. A majority of the voters decided that the tax should be discontinued as of July 1, 1998 — the date of the scheduled final payment on the 1949 bond initiative.
In February 1998, five months before the last scheduled payment on the 1949 bonds was due, the Authority authorized another bond initiative in order to finance the cost of building a County Health Clinic. It sold its Hospital Tax Anticipation Warrants (the “1998 Warrants”), in the aggregate principal amount of $1.5 million. The warrants were secured by the anticipated proceeds of the Special Health Care Tax, beginning in February 1998, when the final payment on the 1949 bonds was actually paid. The payment of the principal and interest on these bonds was insured by Ambac.
On July 15, 1998, the Commission adopted a resolution and order that lowered the tax rate of the Special Health Care Tax to zero mills on each dollar of property. Consequently, because there were no proceeds, the Special Health Care Tax could not be used to make payments on the bonds that the Authority had issued five months earlier.
The Commission and the County filed this action in the Blount Circuit Court asking for a declaratory judgment. The trial court entered a declaratory judgment upholding the reduction of the tax rate by the Commission.
These appeals bring two questions before this Court: (1) Is Act No. 114 constitutional, and, if so, did it effectively terminate the Special Health Care Tax with the last payment on the 1949 bonds; and (2) if the Special Health Care Tax was in effect after payment of the 1949 bonds was complete, can the Commission, under Amendments 76 and 373, Ala. Const. 1901, decrease the Special Health Care Tax after the Authority has already issued warrants on a new bond initiative secured by that tax?
First we address the constitutionality of Act No. 114. That Act reads in pertinent part:
“Section 1. The governing body of Blount County is directed and required to call and provide for holding an election by the qualified electors of the county at which there shall be submitted *445 to the qualified electors participating therein the following question: ‘Do you favor the continued collection in Blount County of the special ad valorem tax for public hospital purposes, which said tax was heretofore levied and is currently being collected under authority of [Amendment 76] to the Constitution of Alabama ... ?’
[[Image here]]
“Section 3. If the result of the election indicates that the sentiment of a majority of the electors voting therein is against the continued levy of the tax, then the county governing body shall not after such date pledge the proceeds of such tax to any new debts, and shall cease to levy such tax as soon as all the outstanding debts to which the proceeds of such tax had been pledged at the time of such election are paid in full.”
As noted within the Act, the Legislature claimed authority to pass this bill under Amendment 76 of the Constitution. That amendment reads in pertinent part:
“If a majority of the qualified electors of any county in the state, except Mobile and Jefferson counties, who participate in an election held therein pursuant to the provisions of any amendment to the Constitution heretofore adopted shall vote at such election in favor of the levy and collection of a special county tax, within the limitations provided in such amendment, for any one or more of the purposes included within the meaning of the term public hospital purposes, the proceeds derived from the tax authorized at such election may be applied for any one or more of the purposes for which said tax may be so voted. Whenever the tax shall be voted the governing body of the county may anticipate the proceeds therefrom for any one or more of the purposes for which the tax shall be voted by issuing, without further election, interest bearing tax anticipation bonds, warrants, or certificates of indebtedness of said county payable solely from and secured by a pledge of not exceeding 75% of the annual proceeds from said tax received by the county.”
While this Amendment provides for the adoption of a tax; it says nothing concerning the abrogation of a tax adopted under this Amendment. Likewise, no other Constitutional provision addresses the abrogation of such a tax. However, Art. IV, § 104, of the Constitution states:
' “The legislature shall not pass a special, private, or local law in any of the following cases:
[[Image here]]
“(15) Regulating either the - assessment or collection of taxes, except in connection with the readjustment, renewal, or extension of existing municipal indebtedness created prior to the ratification of the Constitution of eighteen hundred and seventy-five.”
(Emphasis added.) The parties asked the attorney general to give an opinion on the constitutionality of the Act. In doing so, the attorney general pointed out § 104, saying that it prevented the Legislature from taking the action that it did in passing Act No. 114. Opinion of the Attorney General, January 7, 1998, p. 8. Furthermore, he stated,
“As a general rule, this Office defers to the courts on questions on the constitutionality of acts of the Legislature, as only a court of competent jurisdiction can declare such an act unconstitutional. In this case under consideration, it is the opinion of this Office that should the question of the constitutionality of Act No. 114 be presented to a court it would be declared to be unconstitutional.... Accordingly, an election held pursuant to Act No. 114 would be held to have been of no effect.”
*446 Id. at p. 9. We agree with the attorney general. The Legislature, in adopting Act No. 114, passed a local law that regulated the assessment and collection of taxes. That action is expressly prohibited by the clear and uncontroverted language of § 104(15) of the Constitution. Therefore, Act No. 114 is unconstitutional; the vote it authorized was a nullity; and the Special Health Care Tax continued to be a valid tax and could be collected after the payment of the 1949 bonds was complete.
Because the Special Health Care Tax remained valid after July 1998, we consider the second question before us — whether the Commission validly reduced the Special Health Care Tax from four mills on every dollar of property to zero mills on every dollar of property.
However, before we can consider the Commission’s reduction in the tax rate, we must determine whether the Authority had the power to authorize the bond initiative and to pledge the proceeds of the Special Health Care Tax to make payments on the bonds. Amendment 76 to the Alabama Constitution allows the Com-' mission to create a body as its agent “to acquire, construct, equip, operate and maintain public hospital facilities.” The County acted pursuant to that power when it created the Authority. Amendment 76 goes on to enumerate the powers the Authority shall have under that amendment:
“When a public corporation shall be so designated, the proceeds of said tax thereafter collected shall be paid over to it and shall be used by it for any one or more of the purposes for which the tax shall have been voted.... Said public corporation may anticipate the proceeds from said tax so required to be paid to it by issuing, for any one or more of the purposes for which the tax shall have been voted, the bonds, warrants, or certificates of indebtedness of said public corporation, and may pledge for the payment of the principal thereof and interest thereon not exceeding 75% of the annual proceeds from said tax so paid to it.”
Therefore,-it is clear that, under the Constitution, the Authority could anticipate the proceeds from the Special Health Care Tax and pledge them to pay the 1998 warrants.
Because the Authority’s pledge of the Special Health Care Tax was valid, we must now determine whether the Commission had the power under the Constitution to decrease the amount of the tax from four mills on every dollar of property to zero mills on every dollar of property even though the Authority, acting as the agent of the County, had pledged the proceeds that were to be collected from the four-mill tax.
Amendment 373 of the Alabama Constitution reads in pertinent part:
“(e) A county, municipality or other taxing authority may decrease any ad valorem tax rate at any time, provided such decrease shall not jeopardize the payment of any bonded indebtedness secured by such tax.”
This language clearly states that the County could reduce the Special Health Care Tax at any time, provided the reduction did not “jeopardize the payment of any bonded indebtedness secured by [the] tax”; thus, the reduction could not jeopardize payment of the 1998 warrants validly issued by the Authority. Therefore, we must determine whether the Commission’s reduction in the tax rate jeopardized the payment of the 1998 warrants.
The term “jeopardize” is defined as: “to expose to danger or risk: imperil.” Merriam Webster’s Collegiate Dictionary (10th ed. 1997). Applying this definition, we must determine whether the Commission’s *447 reduction of the rate of the Special Health Care Tax endangered or imperiled the payments on the bond issue.
The bond agreement provided for the source of the payments on the bonds and pledged certain moneys for the payment of the bonds:
“Section 7. Source of Payment and Pledge of Proceeds from the Special Hospital Tax; Priority of Pledge. The principal of and the interest on the Series 1998 Warrants shall be primarily payable from the Pledged Tax Proceeds paid to the Authority, pro rata and on parity of lien and pledge with any Additional Warrants that may hereafter be issued by the Authority. To the extent that the Pledged Tax Proceeds shall not be sufficient to pay the principal of and the interest on the Series 1998 Warrants, the Authority will pay the said principal and interest from any funds that shall be available to it; and in no event will the Authority fail to pay the principal of and the interest on the Series 1998 Warrants when due.
“So much of the Pledged Tax Proceeds paid to the Authority as may be necessary for such purpose are hereby irrevocably pledged for payment of the principal of and the interest on the Series 1998 Warrants, pro rata and on a parity one with the others and with any Additional Warrants that may hereafter be issued by the Authority. The Authority represents and agrees that the Series 1998 Warrants shall constitute preferred claims against the proceeds of the Special Hospital Tax paid to the Authority, pro rata with any Additional Warrants at any time outstanding, and that all Parity Warrants shall have precedence over claims for salaries or other operating expenses of the Authority, or for any other purpose, and that the said pledge will be prior and superior to any pledge or agreement respecting the Pledged Tax Proceeds paid to the Authority for the benefit of or with respect to any securities that may hereafter be issued other than Additional Warrants, as well as any contract that may hereafter be made by the Authority other than contracts for the benefit of Additional Warrants.”
(Emphasis added.) The term “Pledged Tax Proceeds” is defined in the bond agreement:
“ ‘Pledged Tax Proceeds’ means 75% of the proceeds from the Special Hospital Tax that shall be paid to the Authority from time to time, which are pledged to payment of the Series 1998 Warrants in Section 7 of this [bond agreement].”
(Emphasis added.) The definition of “Pledged Tax Proceeds” clearly states that the term refers only to the received tax proceeds that have been pledged to the 1998 warrants. In other words, only the proceeds from the Special Health Care Tax that were collected from February 1998 — when the bonds were issued — forward would be included in the “Pledged Tax Proceeds” — any tax revenue received before that time would not be included. When this definition is inserted into Section 7 of the bond agreement, one must read it as clearly stating that the only moneys that have been pledged to pay for this bond issue are those collected from the Special Health Care Tax after February 1998. The bond agreement does state that if the taxes are inadequate, the Authority shall make the payments from any funds available to it, presumably including the Authority’s reserve fund of approximately $4.8 million. However, nothing in the bond agreement prevents the Authority from spending the entire reserve, as well as any other funds that it has on hand, before the time at which tax proceeds might become inadequate to make *448 the scheduled bond payments. Thus, the bond agreement does not prevent the Authority from spending its entire $4.8-mil-lion reserve on some other project tomorrow. If, at the same time, the proceeds from the taxes become inadequate to pay the bonds, the Authority will have no funds left to make payments on the bonds.
Furthermore, the bond agreement provides that payments to the bondholders are to be made out of a fund, the Warrant Fund, which was set up specifically for that purpose. The Warrant Fund received a certain amount of funds from the initial sale of the bonds, as well as moneys collected from the Special Health Care Tax every year. The portion of the bond agreement that set up the Warrant Fund also provided for a situation where the amount of tax collected did not equal the amount needed to be paid on the bond issue for that year. In that situation, the Authority would make payments into the Warrant Fund to make up the difference, and the bond agreement provided that those payments “shall be made therein first from the proceeds of the [Special Health Care Tax] paid to the Authority and then from any other funds of the Authority that shall be available for that purpose.” As with § 7, discussed above, this section does not prevent the Authority from spending the moneys in reserve or those moneys collected from the Special Health Care Tax before February 1998 before an occasion of inadequate tax proceeds arises.
Nothing in the bond agreement sets aside the reserve money in a trust, escrow, or any other kind of account that would protect it until a time when it might be needed in order to pay the bonds because of inadequate tax proceeds. The only moneys that are specifically pledged for payment on the bonds are the proceeds from the Special Health Care Tax from February 1998 forward.
Once the Commission lowered the tax rate to the point where the income from the tax in a given year would be inadequate to cover the amount the County is required to pay the bondholders in that year, it eliminated the only pledged source of money that was to be used to pay the bondholders. The Commission argues in its brief that this action did not jeopardize the payment of the bonds because, it argues, the Authority has approximately $4.8 million in reserve that it can use to pay the bonds. However, as noted above, this money has not been pledged to secure the bond payments. Instead, the use of this money is completely within the discretion of the Authority, under Amendment 76 of the Alabama Constitution. Under that Amendment, once the Authority was created, “the proceeds of said tax thereafter collected shall be paid over to it and shall be used by it for any one or more of the purposes for which the tax shall have been voted." (Emphasis added.) The Authority has complete constitutional discretion over the $4.8 million, and it is not required to retain that money to pay bonds in case the proceeds from the Special Health Care Tax are not sufficient to satisfy the bond payments. Thus, the $4.8 million cannot be considered security for the bond payments.
Because the $4.8 million in reserve is not security for the bond payments, the only security is the insurance policy issued by Ambac. The policy insures the principal and interest on the 1998 warrants. When Ambac agreed to issue the policy, it did so relying on the pledge of the tax proceeds to pay the principal and interest on the 1998 warrants. If the Special Health Care Tax has been effectively eliminated by the Commission, then the contract between Ambac and the Authority has been breach *449 ed, because Ambac relied on the assumption that there would be a four-mill tax on every dollar of property in the county. Without proceeds from the Special Health Care Tax to make bond payments, Ambac is no longer obligated to insure any loss. Therefore, the insurance policy, also, is not security for the bond payments.
The result of the Commission’s reduction in the rate of the Special Health Care Tax is that the only moneys pledged for bond payments will be insufficient to pay the bond payments, and, after the elimination of the tax, no security exists that will provide for the payments if the Authority is unable to make them. This certainly places the payment of the bonds in jeopardy, in violation of Amendment 373 of the Alabama Constitution. Therefore, the Commission’s actions in reducing the Special Health Care Tax to a rate that would produce proceeds less than the amount needed to make the bond payments after the Authority had validly pledged the proceeds of that .tax to pay the 1998 warrants was unconstitutional. The trial court erred in entering the declaratory judgment upholding the reduction.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, LYONS, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
SEE, J., concurs in part and dissents in part as to the rationale, and dissents from the judgment.